WILLIAM CROSBY

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Ottawa March 30, 1891.*

1. EVIDENCE—*whether admissible.* On the trial of a man and woman for an assault with intent to murder, there was proof sustaining the declarations of the woman, made the night after the arrest, that she did not do the work, but that the man did it. In answer to the question why she did not make an outcry if she did not do the work, she replied she was afraid of her life. On motion of the man to exclude these declarations, the court ruled that the testimony was only competent as against the woman, and excluded the same as against her co-defendant, and the State's attorney said the evidence was only offered as against the party making the declaration: *Held,* that there was no error in admitting the evidence, so limited in its application.

2. On the trial of one for an assault with intent to murder, the prosecuting witness testified that she had no personal acquaintance with the defendant, and had never spoken to him but once, when he came to her room to borrow a glass. The defendant proved by a witness, without objection, that he had been in her room three or four evenings before the assault, with another person and the defendant. The question was then put to the witness, "Just tell what you did there," to which an objection was sustained. The witness then testified: "I know of my own knowledge that B. (the prosecutrix) was personally acquainted with the defendant before the occurrence of this difficulty,—he had been in her room several times:" *Held,* that there was no prejudicial error in the ruling.

3. On the trial of an indictment for an assault with intent to murder, it appeared that the defendants, a man and woman, after midnight went to the room of the prosecutrix and called her out into the hall, where they made a very violent assault upon her. On cross-examination of the prosecutrix it was sought to be shown that she had been an inmate of houses of prostitution, and was, at the time of the assault, renting rooms adjoining her own for the purpose of assignation, etc.: *Held,* that the evidence was properly excluded, as furnishing neither provocation, justification nor excuse for the assault.

4. On the trial of defendant for an assault with intent to murder, proof that the person assaulted had some days before written a letter to defendant's wife accusing him of improper intimacy with another woman, which came to his knowledge a few days before the assault, is

137 325|
165 630|
137 325|
182 418|
137 325
190 <sup>c</sup>517
137 325|
197 <sup>8</sup>175|
137 325|
199 <sup>6</sup>179|
199 <sup>6</sup>183|

not admissible on the part of the defense. The contents of such a letter could not be such a provocation, in law, as to reduce the killing, if death had ensued from the assault, from murder to manslaughter.

5. SAME—*whether competent for co-defendant.* On the trial of two for a crime, the declarations of one defendant, made after the arrest, are not competent evidence for the other defendant, whether they may tend to implicate the party making them, or to excuse his co-defendant.

6. CRIMINAL LAW—*assault with intent to murder—elements of the offense.* In a prosecution for an assault with intent to murder, or commit some other felony, the specific intent charged is the gist of the offense. To constitute the offense of an assault with intent to murder, the facts must be such that if death ensues from the injury inflicted the aggressor would be guilty of murder; but it does not follow that in every case where the act would be murder if death ensues, an assault with intent to commit murder, death not ensuing, can be maintained.

7. SAME—*intention and malice—presumption.* If one, with an abandoned and malignant heart and a reckless disregard of human life, makes an assault upon another, which, in its manner and circumstances, is likely to produce the death of the party assailed, not only will malice be presumed, but the specific intent to take life may also be inferred, for the reason that if, with malice, he makes an assault in a manner likely to produce death, he must be presumed to intend the result likely to, that is, which probably and naturally would, flow from his act.

8. It is not necessary to a conviction for an assault with intent to commit murder, that an express intention shall be proved. Every sane man is presumed to intend the natural and probable consequences of his unlawful acts. The intent may be inferred from the acts of the person charged with crime, as well as from words or declarations.

9. SAME—*intent, how proven.* The intent with which an act is done is a question of fact, either to be shown by the declarations of the party, or to be inferred from the character, manner and circumstances of the assault. While the intent can not be implied as a matter of law, it may be inferred from the use of a weapon or instrument calculated to produce death, or from an act of violence from which, ordinarily, in the usual course of things, death or great bodily harm may result.

10. SAME—*as to manner and extent of assault.* It does not follow because the wounds and injuries received by a person assaulted and beaten are not such as would be usually and probably fatal within themselves, that the assault could not have been or was not made in a manner likely to produce death, or was not made with the intent to kill or murder. The manner of an assault should not be confounded with its results.

11. SAME—*drunkenness—how considered.* Drunkenness, both at the common law and under our statute, is no excuse or palliation for crime

committed or consummated; but when the nature and essence of the offense is by law made to depend upon the state and condition of the mind of the accused at the time, and with reference to the acts done, drunkenness, as a fact affecting the control of the mind, is proper for the consideration of the jury.

12. On a prosecution for an assault with intent to commit murder, the defendant may show in defense that from drunkenness he was incapable of forming any intent whatever, and especially the specific intent charged. But for any act done or committed, as, an assault and battery, his drunkenness furnishes no excuse whatever.

13. SAME—*two defendants—instruction misleading.* On the trial of two defendants for an assault with intent to kill and murder, an instruction which is liable to mislead the jury into the belief that both defendants must have had the intent to kill the person assailed before either can be convicted, is properly refused.

14. SAME—*provocation to reduce murder to manslaughter.* The rule is well settled that no words or gestures, however provoking or insulting, can amount to that considerable provocation which the law recognizes as necessary to reduce a homicide from murder to manslaughter.

15. SAME—*voluntary manslaughter—what constitutes.* In cases of voluntary manslaughter there must be serious and highly provoking injury inflicted upon the person killing, sufficient to excite an irresistible passion in a reasonable person, or an attempt by the person killed to commit a serious personal injury on the person killing, and the killing must be the result of that sudden, violent impulse of passion supposed to be irresistible.

16. INSTRUCTIONS—*right to—based on evidence.* Where there is evidence tending to prove the existence of a given fact, the party will have the right to an instruction, based on such evidence, presenting the law applicable to such fact.

WRIT OF ERROR to the Circuit Court of Peoria county; the Hon. L. W. JAMES, Judge, presiding.

Plaintiff in error, William Crosby, was indicted in the Peoria circuit court, jointly with one Lottie White, for an assault upon Belle Bennett with intent to murder. A trial resulted in the acquittal of White and finding Crosby guilty, and, a motion for a new trial being overruled, he was sentenced, on the verdict, to confinement in the penitentiary for the term of five years.

It is undisputed that about twelve o'clock, or between twelve and one o'clock, of the night of April 2, 1890, the defendants went to the room in which the woman Bennett was sleeping, and called her to the door, and that upon coming to the door in the dark she was pulled into the hallway, assaulted, and severely beaten. There is no evidence tending to show that deadly weapons were used, the battery being inflicted with the hands and feet of the assailants. There is some conflict in the evidence as to what occurred at the door and in the hallway, and as to the nature and extent of the injuries inflicted. Bennett swears, that upon coming to the door, without a word being said, Crosby seized her by the hair and pulled her into the hallway, struck her in the face, and threw her on the floor; that she screamed, and he then choked her, kicked her and stamped her with his feet, upon the face, head and shoulders, from six to eight times; that defendant White also kicked her four or five times. The physician who was called to attend her, found her wrist was dislocated, one eye closed by a swelling, her lips swollen, and abraded scratches and other bruises on her neck, face and other parts of her body; that there were symptoms of injury to the spine, which, however, yielded to treatment, and at another time symptoms of erysipelas were manifest, but were overcome; that the injuries were not, within themselves, necessarily or probably fatal. On the other hand, Crosby testified that, after looking for a letter with Lottie White in her room, they went to Bennett's room and called her up; that upon her coming to the door he asked her why she had been writing letters to his wife in relation to an intimacy between himself and Lottie White, and she replied, "because she had a right to," and thereupon he caught her by the arm and pulled her into the hallway, and struck her in the face; that he struck her but once, and that was upon the jaw; that in the scuffle that ensued both fell to the floor; that he neither stamped nor kicked her at all, and struck her but the one blow. Lottie White testified that they called

Bennett to the door, and Crosby pulled her into the hall, struck her, and threw her on the floor; that she slapped Bennett with her open hand, four or five times; that Crosby told her that Bennett had written letters to his wife, and that she said she wanted to show him a letter that she had that Bennett had written; that they then went to White's room, looked for the letter, and could not find it; that he then proposed that they "go and lick" Bennett, and wanted the witness to go to her door, which she refused to do—"he said I had to be game;" that they then went to Bennett's door and knocked, whereupon he said, "Belle, I want to speak to you;" that she came to the door, and Crosby reached in and grabbed her by the hair of the head, "and I slapped her probably four or five times, with my open hand;" that she could see by the shadows that Crosby was pounding her in the face; that they were on the floor; that she went over to Crosby and said, "For God's sake! do you want to kill the woman?" but that he kept on pounding her; that when he quit, witness helped her up and to her door; that Bennett fell over at the door—"she fell down and fell against the door sill;" that she did not kick Bennett or see her kicked; that it was very dark in the hall.

Other facts necessary to an understanding of the case are sufficiently stated in the opinion of the court.

Messrs. WORTHINGTON, PAGE & BRADY, for the plaintiff in error:

The court erred in rejecting the testimony offered in reference to the letters written by the prosecuting witness to Crosby's wife. Taken in connection with the statement of Mrs. Bennett they showed great provocation. It was proper to show a want of premeditation or a sudden heat of passion. There must be that malice and premeditation which would have made the defendant's acts murder, if death had ensued. *State* v. *Neal*, 39 Me. 469; *Roberts* v. *People*, 19 Mich. 415.

If the jury should say it would have been manslaughter and not murder, then they must say, if death does not follow, it was not an assault with intent to murder. Proof of provocation is admissible on a charge of intent to murder. *Maher* v. *People,* 10 Mich. 225.

There was error both in giving and refusing instructions. The gist of the charge was the intent to murder. This is a felony of the gravest character. *Conolly* v. *People,* 3 Scam. 476; *Hamilton* v. *People,* 113 Ill. 34; 2 Wharton on Crim. Law, sec. 1282.

The actual intent to murder must exist at the time of the assault. *Maher* v. *People,* 10 Mich. 217; *Brown* v. *State,* 11 S. W. Rep. 412; Bishop on Crim. Law, sec. 730.

It must be such an assault that if death ensues it is murder. *State* v. *Anderson,* 2 Tenn. 6; *Smith* v. *State,* 83 Ala. 26; *People* v. *Vinegar,* 2 Park. Cr. 24; *State* v. *Neal,* 37 Me. 468.

Intent must be specifically proved as alleged. 3 Greenleaf on Evidence, secs. 13-17; *Barr* v. *People,* 113 Ill. 471; *Morman* v. *State,* 24 Miss. 54; *Million* v. *People,* 6 Bradw. 537.

It is a question of fact to be proved—not an inference of law. *Roberts* v. *People,* 19 Mich. 415; *State* v. *Stewart,* 29 Mo. 419; 2 Thompson on Trials, 1887; 1 Bishop on Crim. Law, sec. 735; *State* v. *Beaver,* 5 Del. 508; *State* v. *Johnson,* 3 id. 371; *People* v. *Munn,* 65 Cal. 214.

Upon the whole question of presumptions great stress is laid upon the weapons used. *Wellar* v. *People,* 30 Mich. 19; 1 Russell on Crimes, 734; Roscoe on Crim. Ev. 734-740; *Darry* v. *People,* 10 N. Y. 120; *Turner's case,* 1 Raym. 144.

The seventh instruction given for the People is also clearly bad, being based upon the condition of the jury believing, from the evidence, that "Belle Bennett was assaulted in such a manner that, as a natural and ordinary consequence thereof, death might have been caused." There was no testimony to justify such a hypothesis.

The instructions given in *Perry* v. *People*, 14 Ill. 496, and approved in *Conn* v. *People*, 116 id. 464, are based upon entirely different facts. In each of those cases the defendant fired a pistol, and it may well be held, that when a defendant uses a deadly weapon, such as a pistol, with malice prepense, or with a total disregard of human life, in such a way that death is likely to follow, intent to murder may be inferred.

When death does not ensue and deadly weapons are not used, intent to murder is not to be presumed. *Roberts* v. *People*, 19 Mich. 415.

Only natural and probable consequences are presumed to be intended. 1 Bishop on Crim. Law, sec. 35.

Where the intent is not proved the court will reverse. *Garrity* v. *People*, 70 Ill. 84; *Slattery* v. *People*, 76 id. 219; *Feister* v. *People*, 125 id. 348.

The fourth instruction for the People tells the jury that drunkenness constitutes no defense, even if so extreme as to make the defendant unconscious of what he is doing. The fourteenth instruction asked by defendant, and which was refused, was to the effect that if the jury believed the defendant was so deeply intoxicated as to be incapable of forming an intent to murder, the jury should acquit of the charge of an assault with intent to murder. We insist that this is the law where intent is the gist of the offense, and cite Bishop on Crim. Law, sec. 492; *Mooney* v. *State*, 33 Ala. 319; *State* v. *Garry*, 11 Minn. 103; *Bartholomew* v. *People*, 104 Ill. 606.

It is a question of fact, for the jury, whether defendant was too intoxicated to form intent. *Commonwealth* v. *Hagenlock*, 140 Mass. 125.

Mr. GEORGE HUNT, Attorney General, for the People:

Evidence showing that if death had ensued the killing would have been murder, will support an indictment for an assault to murder. 1 Russell on Crimes, 743; 2 Wharton on Crim. Law, sec. 1281; Moore on Crim. Law, sec. 39; 21 Ga. 220.

Intent to murder may be shown by defendant's acts as well
as by his words. *Fitzpatrick* v. *People*, 98 Ill. 269; *Lane* v.
*State*, 85 Ala. 11.

Mere words never reduce a homicide from murder to man-
slaughter. *Lane* v. *State*, 85 Ala. 11.

Exception is taken to instruction No. 4, in relation to drunk-
enness. That instruction is in the language of the statute,
and proper. *Fitzpatrick* v. *People*, 98 Ill. 269; *Upstone* v.
*People*, 109 id. 169.

Mr. JUSTICE SHOPE delivered the opinion of the Court:

Plaintiff in error and another were indicted for an assault
with intent to murder one Belle Bennett, in the Peoria circuit
court. That a violent assault and battery, at about midnight
of April 2, 1890, were made upon her by plaintiff in error, or
his co-defendant, Lottie White, or by both, is practically con-
ceded, and, if it was not, is abundantly proved. There is but
little difference in the account given of the assault by the
prosecuting witness and the defendants, except as to whether
they kicked and stamped her. The prosecuting witness was
strongly corroborated by the nature and extent of her injuries,
while there is palpable conflict between the defendants in their
account of what took place, so that the jury were justified in
giving credence to her testimony, as they evidently have done,
rather than to that of defendants.

Complaint is made of the rulings of the circuit court, both
in respect of the introduction of evidence, and in giving, modi-
fying and refusing instructions. It is first said, the court
erred in refusing to permit plaintiff in error to show, by the
cross-examination of Bennett, that she had been an inmate of
houses of prostitution, and was, at the time of the assault,
renting rooms adjoining her own, for purposes of assignation,
etc. It is assumed that this evidence would in some way ac-
count for plaintiff in error going there at twelve o'clock at

night, when he would not, as it is said, have gone to the room of a virtuous woman. The evidence was properly excluded. It could not, in any view, tend to show why plaintiff in error would go to Bennett's room to assault her, when he would not have gone elsewhere to assault another against whom he had, or thought he had, the same provocation, and upon whom the assault could be made with like impunity. However amenable to the law the Bennett woman may have been, that furnished neither provocation, justification nor excuse for the assault.

It is next objected that the court erred in refusing to permit Belle Bennett to be contradicted. She had sworn that she had no personal acquaintance with Crosby, and had never spoken to him but once, when he came to her room to borrow a glass. The witness Orlando Warner testified, without objection, that he had been in Bennett's room three or four evenings before the difficulty took place, with a gentleman named Brady, and plaintiff in error. The question was then put, "Just tell what you did there," which was objected to, and the objection sustained. The witness then testified: "I know of my own knowledge that Belle Bennett was personally acquainted with the defendant before the occurrence of this difficulty. He has been in her room several times." It is not perceived how it could become important to know precisely what was done or said on the occasion referred to by the witness. The point upon which she was sought to be contradicted was, whether she had met and was acquainted with Crosby. To this the witness testified fully. The ruling was not prejudicial error.

On the trial the People produced as a witness Mr. Fash, captain of the police, who testified that he had a conversation with Lottie White the night of her arrest, April 4, 1890, and that she then said that she did not do the work—that Crosby did it. The witness then asked her why she did not make an outcry, to warn people, if she did not do the work, and she

replied, she was afraid of her own life. A motion was made, on behalf of plaintiff in error, to exclude these declarations, whereupon the court ruled: "The testimony is only competent so far as Lottie White is concerned—it will be excluded as against everybody but Lottie White," and the State's attorney also said it was only offered as against Lottie White. It must be presumed that the jury were men of average and ordinary intelligence, and that they would not consider evidence as tending to show guilt upon the part of Crosby which both the court and State's attorney directed should be considered only' as to his co-defendant, Lottie White.

It is, however, said, that this ruling becomes important in view of the refusal of the court to permit Crosby to prove, by the witness Simpson, the declarations of Lottie White made directly after the affray. By looking into the abstract it will be seen that these declarations were excluded upon the objection of Lottie White, the co-defendant, and not under the' objection of the People. This ruling might be error of which the People might justly complain as being prejudicial to their' case against Lottie White, but the declarations of Lottie White made after the affray and after arrest were not competent evidence for Crosby, whether they tended to implicate her or to excuse him.

The defense introduced evidence tending to show that the occasion of Crosby and Lottie White going to the room of the Bennett woman was, that the latter had written letters to Crosby's wife, in which were intimations, at least, of improper conduct between Crosby and Lottie White, and counsel say' "that the sole object of Crosby's going to her room the night of the difficulty was to call her to account for it, and to induce her to quit writing such letters," and as preliminary proof it is said, it was necessary to prove the contents of these letters, either by producing them, or, if unable to produce them, by proving their contents. A witness was called for this purpose, and, upon objection being made, the evidence was held to be

incompetent. Crosby testifies that when Bennett came to her door he first asked her why she had been writing letters to his wife, and that she replied, because she had a right to. Both Bennett and White contradict Crosby in this. But conceding his testimony is to be received as the basis for its reception, we are of opinion that the evidence is wholly incompetent. It is true that if the defendant was on trial for murder,—and possibly in this case,—the evidence that the letters had been written to his wife imputing such misconduct might have been competent, as tending to show a motive for the assault,—not in justification or excuse, but as denoting previous provocation or ill-will, which, if passion had time to cool, might degenerate into deliberate malice. Indeed, if the testimony of White is to be credited, the fact of such letters having been received by the wife of Crosby was the provocation for visiting Bennett's room, and inducing in the mind of Crosby such hatred and ill-will toward Bennett as that he proposed calling her from the quiet of her room into the dark hallway at the hour of midnight, and, in the language of the witness, "licking her." The evidence of the witness Hutchins, produced by defendant Crosby, is to the effect that Crosby and White were in his saloon, drinking, until near twelve o'clock, and that the last time he served them, just before they went out, Lottie White said to Crosby, "Let us go lick this woman." It is manifest from this proof, that both White and Crosby were actuated by malice, superinduced by the writing of letters by Bennett to Crosby's wife, which, as they supposed, assumed to implicate them in improper conduct. The production of the letters, or proof of their contents, could only have been offered for the purpose of justifying or excusing such malice and ill-will. It is clear from the testimony that Crosby knew of these letters some time before the assault, and if it could be conceded that they were otherwise sufficient provocation to reduce the killing from murder to manslaughter if death had ensued from the battery, they were not that sudden provocation re-

quired by the law to mitigate the killing. If, as testified to by Crosby, when asked why she had written the letters, Bennett replied, "because she had a right to," this would be no justification for the assault. The rule is well-settled, that no words or gestures, however provoking or insulting, can amount to that considerable provocation which the law recognizes as necessary to reduce the killing from murder to manslaughter. Nor, as it seems to be supposed by counsel, would these words, coupled with the letters previously written, have been any sufficient provocation, in law, to reduce the killing from murder to manslaughter, had death ensued. In cases of voluntary manslaughter there must be serious and highly provoking injury inflicted upon the person killing, sufficient to excite an irresistible passion in a reasonable person, or an attempt by the person killed to commit a serious personal injury on the person killing, and the killing must be the result of that sudden, violent impulse of passion supposed to be irresistible.

It is too clear for argument that defendants went to the room of Bennett for the purpose of avenging the injury that she had inflicted upon them by letters they assumed, whether true or false, she had written to Crosby's wife, and in pursuance of such purpose committed the assault. It seems idle to contend that the production of the letters or the proving of their contents, showing that she had in fact written them, and made charges therein implicating the defendants in improper intimacy, could have done more than have fixed upon the defendants the malicious purpose of their visit and assault.

In prosecutions of this character the specific intent charged is the gist of the offense, and it must be such an assault that if death ensues it is murder. It, however, by no means follows that in every case where the killing would be murder if death ensues, an assault with an intent to commit murder, death not ensuing, can be maintained. It is not necessary to a conviction, however, that an express intention need be proved. Every sane man is presumed to intend the natural

and probable consequences of his act, and it has been uniformly held, therefore, that the intent may be inferred from the acts of the person charged with crime, as well as by words or declarations. (2 Wharton on Crim. Law, sec. 1281; *Fitzpatrick* v. *People*, 98 Ill. 269; *Weaver* v. *People*, 132 id. 536; *King* v. *State*, 21 Ga. 220.) The intent with which the act was done is a question of fact, either to be shown by the declaration of the party, or to be inferred from the character, manner and circumstances of the assault. Thus, it was said in *Lane* v. *State*, 88 Ala. 11: "Intent is a matter of fact, and can not be implied as a matter of law, but it may be inferred from the use of a weapon or instrument calculated to produce death, or from an act of violence from which, ordinarily, in the usual course of things, death or great bodily harm may result." It can scarcely be questioned, from the evidence in this record, that if death had resulted from the beating of Bennett by Crosby and White, done, as appears, in pursuance of a previously formed design, the offense would, in law, have been murder. The purpose was unlawful and the beating unjustifiable, and without legal provocation or excuse. It was not only committed in pursuance of previous malice, but with that wanton disregard for human life that would have rendered the killing murder.

It only remains to consider whether the court properly instructed the jury, and whether the jury were justified, from the facts and circumstances shown, to find that the assault was made with intent to murder.

It is said, speaking generally, that evidence showing that if death had ensued the killing would have been murder, will support an indictment for an assault to murder. (2 Wharton on Crim. Law, sec. 1281.) And in Russell on Crimes (page 743) it is said: "I have no doubt if, from the circumstances, it would have been a case of murder if death had ensued, that would, of itself, be good ground from which the jury might infer the intent" to murder. As before stated, the proof clearly

22—137 ILL.

shows an intent to do an unlawful act,—that is, to inflict chastisement upon the woman Bennett for the assumed wrong she had done to Crosby and wife. Proof of malice, therefore, is not wanting.

The court instructed the jury very fully, and among other instructions gave the following:

"5. The court instructs the jury, that direct and positive testimony is not necessary for proving the intent alleged in the indictment, but such intent may be inferred from the evidence, if there are any facts and circumstances proven that show, beyond a reasonable doubt, that the assault in question was made with an abandoned and malignant heart and a reckless disregard of human life, and in such a manner as was likely to cause the death of the party assaulted."

It is objected that the latter clause of this instruction lays down an improper rule, and that there was no evidence that there was an assault of a character likely to cause the death of the party assaulted. And again, the instruction is divided, by counsel, in argument, and it is insisted that the intent to murder can not be inferred from the facts and circumstances which show, beyond a reasonable doubt, that the assault was made with an abandoned and malignant heart and a reckless disregard of human life. It is sufficient to say that no such division is made of the instruction itself. The jury were told that the intent might be inferred from the evidence, if there were "facts and circumstances proved which show, beyond a reasonable doubt, that the assault in question was made with an abandoned and malignant heart and reckless disregard of human life; and *in such a manner* as was likely to cause the death of the party assaulted." If one with an abandoned disregard of human life makes an assault that, in its manner and circumstance, is likely to produce the death of the party assailed, not only is malice presumed, but the specific intent to take life may also be inferred, for if, with malice, he makes an assault in a manner likely to produce death, he must be

presumed to intend the result likely to, that is, which probably and naturally would, flow from his act.

Complaint is also made of the eighth instruction, which is as follows:

"And the court further instructs the jury, that if they believe, from the evidence, beyond a reasonable doubt, that the defendants, or one of them, assaulted the witness Belle Bennett with malice aforethought or with reckless and total disregard of human life, and the character of the assault was such as was likely to cause the death of such Belle Bennett, then the jury should find the defendant guilty of making such an assault, guilty of an assault with intent to commit murder as charged in the indictment."

It is said this instruction is faulty, as we understand counsel, not because it does not state a correct proposition of law, but because there was no evidence tending to support that portion of it which states, that if the jury finds, from the evidence, that "the character of the assault was such as was likely to cause the death of Belle Bennett," and therefore the instruction was improper. It will not be necessary to notice this objection *in extenso.* The instruction fairly left it to the jury to determine whether the character and manner of the assault were such as were likely to cause the death of Belle Bennett. As we have seen, it will be presumed that the plaintiff in error, if sane, and capable of forming an intent, as he must be presumed to be until the contrary appears, intended all of the natural, usual or probable consequences flowing from his act. Counsel confound the manner of the assault with its results, and because the physician testifies that the wounds received were not such as would be usually or probably fatal within themselves, that therefore the assault could not have been, or was not, made in a manner likely to produce death. It is true the physician so testifies; but it by no means follows that because the injuries were not such as are likely to produce death of themselves, the assault was not of that character.

It can scarcely be doubted that an assault upon the head, neck and chest of a prostrate woman, with the heel of the boot of a man, might be such as would likely or naturally produce fatal results. If it be said that there is no evidence that the heel of the boot was used, there is evidence that defendant Crosby threw her on the floor and stamped her in the face and upon the head and shoulders with his feet, and we are not prepared to say that the manner of the assault was not such as, in the ordinary course of events, would be likely to produce fatal results. Whether the assault was of that character was a question of fact, for the jury to find from a consideration of the attending facts and circumstances. In view of the fact that for other errors in the record the case must be again submitted, we refrain from further discussion of the evidence. We are of the opinion that there was no error in giving the instructions. *Perry* v. *People,* 14 Ill. 496 ; *Conn* v. *People,* 116 id. 464; *Dunaway* v. *People,* 110 id. 333 ; *Weaver* v. *People, supra.*

Exception is also taken to the fourth instruction given at the instance of the People, which is as follows :

"You are further instructed, that drunkenness is no excuse for the commission of any crime or misdemeanor, unless such drunkenness was occasioned by the fraud, contrivance or force of some other person, for the purpose of causing the perpetration of an offense ; and where the act of a defendant would be criminal if committed when he was sober, the fact that he committed such an act while intoxicated will constitute no defense, unless the intoxication was caused by some other person for the purpose above stated,—and this is the rule even where the intoxication is so extreme as to make such defendant unconscious of what he is doing."

The fourteenth instruction for the defendants, which was refused, contained the following : "And if the jury further believe, from the evidence, that at the time of the alleged assault the defendants were so deeply intoxicated or besotted with

drink that they were incapable of forming an intention to kill the said Belle Bennett, then the jury should acquit the defendants of the crime of an assault with intent to murder." This instruction was properly refused, for the reason that by the part of it preceding that quoted, the jury were liable to be misled into the belief that both defendants must have had the intent to kill said Bennett before either could be convicted of the offense charged. But by the giving of the fourth instruction for the People the question is fairly presented, whether, in prosecutions for assaults with intent to commit a felony, drunkenness to a degree where the defendant is incapable of forming an intent will constitute a defense.

Section 340 of the Criminal Code provides that "drunkenness shall not be an excuse for any crime or misdemeanor unless such drunkenness be occasioned by the fraud, contrivance or force of some other person, for the purpose of causing the perpetration of an offense," in which case the person causing the drunkenness is to be held criminally responsible. The provision that drunkenness shall not be an excuse for crime is simply declaratory of the common law. In 4 Blackstone's Commentaries, 26, it is said: "As to the artificial, voluntarily contracted madness, by drunkenness or intoxication, which deprives men of their reason and puts them into temporary frenzy, our law looks upon this as an aggravation of the offense rather than an excuse for any criminal behavior. The law, considering how easy it is to counterfeit this excuse, and how weak an excuse it is, though real, will not suffer any man thus to privilege one crime by another." In Russell on Crimes (vol. 1, p. 7,) it is said: "With respect to persons *non compos mentis* from drunkenness,—a species of madness which has been termed *dementia affectata*,—it is a settled rule that if the drunkenness is voluntary it can not excuse a man for any crime." Lord COKE (1 Inst. 247,) said: "As for a drunkard, he is *voluntarius dæmon*, he hath no privilege thereby, but what hurt or ill soever he doth his drunkenness doth aggravate it."

So it is said: "He who is guilty of any crime whatever through his voluntary drunkenness shall be punished for it as much if he had been sober." 1 Hawkins' Pleas of the Crown, chap. 1, sec. 6; Hale's Pleas of the Crown, 32; *Rex* v. *Carroll,* 7 C. & P. 145; *Reniger* v. *Fogosa,* Plow. 19.

Very many cases may be found, but these citations will suffice to show the rule at common law. It will be observed that all the cases hold, as our statute provides, that drunkenness is not an *excuse* for crime, and yet the uniform holding is, that where a particular intent is charged, and such intent forms the gist of the offense, as contradistinguished from the intent necessarily entering into every crime,—as, where one crime is thereby aggravated into a higher crime, or a misdemeanor enlarged into a felony,—any cause which deprives the defendant of the mental capacity to form such an intent will be a defense to the graver crime. Thus, in *State* v. *Garvey,* 11 Minn. 154, the defendant was indicted for an assault with intent to inflict great bodily harm, etc., and the trial court refused to hold that a state of mind produced by drunkenness, not voluntarily entered into for the purpose of committing the crime, in which the defendant "did not know what he was doing," was a defense, under the indictment. But the Supreme Court hold the contrary, and say: "If Garvey was so drunk as 'not to know what he was doing,' then he had no intention. He was incapable of forming any intention, and any evidence showing this fact should have been admitted by the court,"—citing *Regina* v. *Cruse,* 8 C. & P. 541, and *Paymen* v. *State,* 14 Ohio, 555. And in *Mooney* v. *State,* 33 Ala. 419, which was an indictment for an assault with intent to commit murder, the court, after holding that the specific intent must be proved, says: "Drunkenness certainly does not excuse or palliate any offense, but it may produce a state of mind in which the accused would be incapable of entertaining or forming the positive and particular intent requisite to make out the offense. In such case the accused is entitled to an ac-

quittal of the felony, not because of the drunkenness, but because he was in a state of mind resulting from drunkenness, which affords a negation of one of the facts necessary to a conviction." So in *Pertle* v. *State*, 9 Humph. 663, where, under the statute, to constitute murder in the first degree the killing must be deliberate and premeditated, it was held that proof of drunkenness was admissible, because it might show that the accused was incapable of forming a deliberate and premeditated design to kill, and therefore the crime be reduced to murder in the second degree. See, also, Am. Crim. Law, sec. 41; *Swan* v. *State*, 4 Humph. 663; *Penn* v. *McFall*, Addison, 255; *Payman* v. *State, supra.*

Drunkenness was, therefore, at common law, as under our own statute, no excuse for crime, but where the nature and essence of the offense is, by law, made to depend upon the state and condition of the mind of the accused at the time, and with reference to the acts done and committed, drunkenness, as a fact affecting the control of the mind, is proper for the consideration of the jury, for if the act must be committed with a specific intent, to constitute the crime charged, and the defendant is incapable of forming any intent whatever, the offense has not been committed. The drunkenness is no excuse for any act done or committed. The defendant may be punished for the consummated offense, whatever it may be; and the want of mind operates, not by way of excuse for crime committed, but renders the accused incapable of committing the graver offense. We are of the opinion that the statute has not changed the rule at common law, and that the instruction, as applied to this case, was erroneous.

It is said, however, that there was not sufficient evidence of drunkenness to establish the mental incapacity of the accused to form the specific intent, and therefore the instruction was not prejudicial error. There was evidence tending to prove that fact. The question of intent, and of the existence of the particular intent, was one of fact, to be determined by

the jury, (*Commonwealth* v. *Hagenlock*, 140 Mass. 125, and cases *supra*,) and the defendant had, under this indictment, the right to have that matter submitted to and passed upon by the jury.

For the error indicated, the judgment is reversed and the cause remanded.                                 *Judgment reversed.*