## Chicago & Joliet Electric Railway Company v. Henry Muff.

### Gen. No. 4,538.

1. PEREMPTORY INSTRUCTION—*when properly denied.* A peremptory instruction is properly denied where there is any evidence tending to prove the plaintiff's case.

2. VERDICT—*when not disturbed.* A verdict will not be set aside as against the weight of the evidence unless it is clearly and palpably so.

Action on the case for personal injuries. Appeal from the Circuit Court of Will County; the Hon. DORRANCE DIBELL, Judge, presiding. Heard in this court at the April term, 1905. Affirmed. Opinion filed August 1, 1905.

E. MEERS, for appellant.

. J. W. D'ARCY, for appellee.

MR. JUSTICE FARMER delivered the opinion .of the court.

Appellee was a motorman on one of appellant's cars, operated by electricity, and running between Joliet and Lockport, on April 8, 1902. While so engaged his car collided with a passenger car on the Santa Fe Railroad, which was being backed across Cass street. Appellant's track ran east and west on Cass street, and a short distance east of Scott street was crossed by the Santa Fe Railroad running north and south. Appellee was injured by the collision and brought this suit to recover damages therefor. He recovered a verdict and judgment for $858, and defendant appeals.

The sole ground upon which a reversal is asked is, that there was no evidence tending to prove appellee's case as charged in his declaration, and that the court erred in not directing a verdict in favor of appellant. There were four counts in the declaration. The first count charged appellant with furnishing appellee a car that was not in reasonably safe condition and repair for use, that by reason of its unsafe condition, which was unknown to appellee but should have been known to appellant, he was unable to stop it and

ran into a car on the Santa Fe Railroad track. The second count, after setting out the duty of appellant with reference to the exercise of care in furnishing its employees cars in reasonably safe condition and with appliances for their management and control that were in reasonably good condition and repair, alleges appellee was furnished with a car having defective brakes and impaired machinery, that it was not in safe condition for use in running and controlling the car, by reason of which he was unable to stop his car as he approached the railroad track and ran into a car on said railroad track while it was crossing appellant's tracks. Another count charged appellant with failing to discharge its duty of keeping its cars and appliances supplied with sufficient electrical current and power to operate and control its cars in starting and stopping them, by reason of which failure, appellee was unable to stop his car and the accident resulted. An additional count alleged it was the duty of appellant to furnish appellee with a reasonably safe car in reasonably good condition and repair, with brakes, brake rods and other appliances in reasonably safe condition, of sufficient strength to enable him to stop the car; but that appellant negligently failed to do its duty in this regard and furnished appellee an old impaired car not in daily or regular use, with an iron brake of insufficient strength and size, with wheels having flat places worn on the outside surface by long use and sliding on the rails with the brakes attached thereto; that said condition of the wheels caused an extra strain and unusual pressure on the brake and appliances when an effort was made to stop the car, and by reason of these defective conditions appellee was unable to stop his car, whereby the injury resulted. The proof showed the car appellee was in charge of when injured, was a large one, and while it was not a very old one, having been in use about two years, it had flat places on the wheels under the front trucks, which had been caused by setting the brakes and sliding the wheels over a sanded track. There was also evidence tending to show an axle was sprung, but

whether this existed before the accident is uncertain.  The car was given appellee at about half past five o'clock A. M. by his brother, Albert Muff, who was at that time night foreman at appellant's car barn and had the duty of assign-ing cars to the motorneers.  It appears from the evidence, this car had been used but little for several weeks before the accident, and objections to using it had been made by employees of appellant to those in charge of its car barns. On objections by counsel for appellant, the witnesses were not permitted to state what objections were made by em-ployees to its use, but it appears appellee had never used it until the morning of the accident and had made one round trip to Lockport before the accident occurred.  Whether there were any defects observable in the appearance of the car other than flat places on the wheels and the bent or sprung axle, if it was bent or sprung before the accident, is not shown by the proof, and whether the flat wheels affected the operation of the appliances for stopping the car, is a matter about which the evidence is conflicting. Appellee and the conductor both testified that on the first trip they made that morning the brake appliances did not work well, and that it was difficult to stop the car at the places desired.  On that trip the load was light, but on the trip when the accident occurred, the conductor testified that the car, which would hold a hundred passengers, was full.  The number of passengers aboard is not stated, but that the car was heavily loaded appears from the testimony of the witnesses that the aisle was full and the rear plat-form occupied.

Cass street is a little down grade to the Santa Fe Rail-road for a considerable distance west of Scott street.  From the east line of Scott street to the west rail of the Santa Fe track is 269 feet and the fall 28 inches, according to the testimony of a civil engineer introduced as a witness by appellant.  Appellee testified that as he approached Scott street, a man signaled him to stop to take him aboard; that he applied the air which he says is generally used in stop-ping the car, but it had no effect, and that about the time

he reached the east line of Scott street he applied the hand-brake. This he said had no effect on the speed of the car, and when half way between Scott street and the railroad track, he saw a passenger car backing south on the railroad track. He testified his car was going about five miles an hour at that time. Appellant says he then reversed the power but that there was no current on the cable at this place, and that, also, was ineffective, and that he then threw the overhead switch, but this proved ineffective also and his car dashed into the car on the railroad track. A passenger testified he was facing the front of the car, and about half way between Scott street and the railroad track noticed a Santa Fe train begin to back down and saw the motorman grab the hand-brake and turn it. Observing no reduction in the speed of the car, he says he hallooed, "We are going to hit the train." He says the motorman was acting quickly and passed from one side of the vestibule in the front to the other, but he could not say what he was doing all the time and did not know how the appliances should be used to control the car. He says the car continued to move right along until it struck the car on the Santa Fe tracks. Another passenger testified he saw the motorman after the car had crossed Scott street grab the hand-brake and at the same time saw the Santa Fe train backing from the north. He says he then turned to get out and did not see what the motorman did after that, but he didn't notice any difference in the movement of the car. Another passenger testified that at about the crossing of Scott street he noticed appellee trying to stop the car by repeatedly turning on the air-brake lever, but it did not slow the car; that the car did not stop at Scott street but its speed increased as it approached the Santa Fe tracks. He says within about fifty feet of the railroad tracks appellee tried the hand-brake and as the car neared the crossing gates he was at the reverse lever; that he was endeavoring by the use of the air-brake, hand-brake and reverse lever to stop his car. This proof tended to show that if the appliances for stopping the car had been in reasonably good condition

and working properly, some effect would have resulted from the use made of them by the motorman. The half way point between the west rail of the Santa Fe track and the east line of Scott street would be 134½ feet, and according to the testimony of two passengers, the hand-brake was applied between the east line of Scott street and the half way point between there and the railroad track. The motorman says he applied the air-brake first before he crossed Scott street, and that failing to work, he applied the hand-brake at about the east line of that street. After the accident, it was found the brake-rod, which was of wrought iron, was broken in two. It was what the witnesses described as a clean break, "just as though you would take a hack saw and saw it right in two." The theory of appellee is that this rod was tightened by setting the brake and drawing the shoe tightly against the flat surface of the wheel, but on account of the flat surface, the revolutions of the wheel would not be entirely stopped but it would slip and catch again, and thus give the rod a jerk each time the flat surface came in contact with the brake-shoe. There is some testimony tending to support this theory, although it is not very clear.

Frederick E. Fisher, who was general manager of appellant at the time of the accident, and William J. Kelsh, appellant's master mechanic, testified the car and its appliances were in good condition to be operated with safety. Both they and Mr. Patterson, who was master mechanic of appellant at the time of the trial, all testified the flat places on the surfaces of the wheels would not interfere with the control of the car by the use of the brakes and appliances for that purpose. They described the mechanism and principles of the use of the hand-brake, the air-brake and the reverse lever, and all claimed the use of one or more of these appliances would have stopped the car in from eight to fifteen feet, and that it would have done this independent of whether there was any current in the trolley wire or not. These three witnesses were men of large experience in their lines and their testimony narrows the

question down really to one of whether appellee told the truth about trying to stop the car. If the appliances for stopping the car had been in reasonably good condition, it would appear there was no reason whatever for the collision if appellant had made use of the appliances in an effort to stop his car. We conclude either that appellee did not use the appliances provided for stopping his car, or that they were not in good condition, or for some reason failed to operate. It will be remembered appellee himself, testified he used all the appliances provided and that none of them produced any effect. That he used some of them is also testified to by three passengers. It cannot be said, therefore, that there was no evidence tending to show appellee's injury resulted from the car and appliances for stopping it, being in a defective condition. There is also evidence tending to show this car had been known for sometime to be in such condition that some of appellant's employees objected to using it. It also further appears that for some reason it had been used very little for some weeks before the accident. If there was any evidence tending to prove the plaintiff's case, it was the duty of the court to submit it to the jury. C. & E. I. R. R. Co. v. Schmitz, 211 Ill. 446. A careful examination of the evidence leads us to the conclusion that it cannot be said there was no evidence tending to prove some one or more of the counts of appellee's declaration, and the trial court, therefore, did not err in refusing to direct a verdict for appellant. Neither can it be said the verdict was so palpably contrary to the evidence as to require a reversal of the judgment of the Circuit Court, and it is, therefore, affirmed.

*Affirmed.*

Mr. Justice DIBELL took no part in the consideration of this case in this court.